**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON**

TANYA L. MUNDY, :

                Plaintiff,

  -vs-

MICHAEL J. ASTRUE,
COMMISSIONER OF
SOCIAL SECURITY,
                Defendant. :

Case No. 3:08-cv-430

District Judge Walter Herbert Rice
Magistrate Judge Michael R. Merz

## REPORT AND RECOMMENDATIONS

Plaintiff brought this action pursuant to 42 U.S.C. §405(g), as incorporated into 42 U.S.C. §1383(c)(3), for judicial review of the final decision of Defendant Commissioner of Social Security (the "Commissioner") denying Plaintiff's application for Social Security benefits. The case is now before the Court for decision after briefing by the parties directed to the record as a whole.

Judicial review of the Commissioner's decision is limited in scope by the statute which permits judicial review, 42 U.S.C. §405(g). The Court's sole function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision. The Commissioner's findings must be affirmed if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971), *citing, Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); *Landsaw v. Secretary of Health and Human Services*, 803 F.2d 211, 213 (6th Cir. 1986). Substantial evidence

is more than a mere scintilla, but only so much as would be required to prevent a directed verdict (now judgment as a matter of law), against the Commissioner if this case were being tried to a jury. *Foster v. Bowen*, 853 F.2d 483, 486 (6th Cir. 1988); *NLRB v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300 (1939).

In deciding whether the Commissioner's findings are supported by substantial evidence, the Court must consider the record as a whole. *Hepner v. Mathews*, 574 F.2d 359 (6th Cir. 1978); *Houston v. Secretary of Health and Human Services*, 736 F.2d 365 (6th Cir. 1984); *Garner v. Heckler*, 745 F.2d 383 (6th Cir. 1984). However, the Court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *Garner, supra.* If the Commissioner's decision is supported by substantial evidence, it must be affirmed even if the Court as a trier of fact would have arrived at a different conclusion. *Elkins v. Secretary of Health and Human Services*, 658 F.2d 437, 439 (6th Cir. 1981).

To qualify for supplemental security income SSI benefits (SSI), a claimant must file an application and be an "eligible individual" as defined in the Social Security Act. 42 U.S.C. §1381a. With respect to the present case, eligibility is dependent upon disability, income, and other financial resources. 42 U.S.C. §1382(a). To establish disability, a claimant must show that the claimant is suffering from a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §1382c(a)(A). A claimant must also show that the impairment precludes performance of the claimant's former job or any other substantial gainful work which exists in the national economy in significant numbers. 42 U.S.C. §1382c(a)(3)(B). Regardless of the actual or alleged onset of disability, an SSI claimant is not entitled to SSI benefits

prior to the date that the claimant files an SSI application. *See,* 20 C.F.R. §416.335.

The Commissioner has established a sequential evaluation process for disability determinations. 20 C.F.R. §404.1520 . First, if the claimant is currently engaged in substantial gainful activity, the claimant is found not disabled. Second, if the claimant is not presently engaged in substantial gainful activity, the Commissioner determines if the claimant has a severe impairment or impairments; if not, the claimant is found not disabled. Third, if the claimant has a severe impairment, it is compared with the Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1 . If the impairment is listed or is medically equivalent to a listed impairment, the claimant is found disabled and benefits are awarded. 20 C.F.R. §404.1520(d). Fourth, if the claimant's impairments do not meet or equal a listed impairment, the Commissioner determines if the impairments prevent the claimant from returning to his regular previous employment; if not, the claimant is found not disabled. Fifth, if the claimant is unable to return to his regular previous employment, he has established a *prima facie* case of disability and the burden of proof shifts to the Commissioner to show that there is work which exists in significant numbers in the national economy which the claimant can perform. *Bowen v. Yuckert,* 482 U.S. 137, 145, n.5 (1987).

Plaintiff filed an application for SSI children's benefits in August, 1992, and her claim was allowed for mental retardation in combination with a personality disorder. (Tr. 427; 220; 428). Plaintiff's benefits were terminated in 1996, when she was placed in a state-supported institution.[1] (Tr. 120; 304).

Plaintiff filed a second application for SSI in September, 1997, which was denied on initial review and Plaintiff took no further appeal. (Tr. 112-13; 107-11).

---

[1] The record indicates that Plaintiff was in the custody of the Department of Youth Services from age eleven or twelve until age seventeen during which time she lived in foster and group homes. *See,* Tr. 613.

3

Plaintiff filed another application for SSI on March 20, 1998, alleging disability from August 1, 1992, due to difficulty reading. (Tr. 45-46; 49-54). Plaintiff's application was denied initially and on reconsideration. (Tr. 33-36; 38-41). A hearing was held by Administrative Law Judge Thomas McNichols, (Tr. 171-210), who determined that Plaintiff was not disabled. (Tr. 11-30). The Appeals Council denied Plaintiff's request for review and Judge McNichols' decision became the Commissioner's final decision.

Plaintiff filed an action in this Court seeking judicial review of the Commissioner's decision. *Mundy v. Commissioner,* No. 3:02-cv-264, filed June 10, 2002 ("*Mundy I*"). On July 29, 2003, Magistrate Judge Norah King filed a Report and Recommendations recommending that the Commissioner's decision that Plaintiff was not disabled be reversed and remanded. *Id.* at Doc. 16; *see also,* Tr. 398-401. In doing so, Judge King determined that Plaintiff satisfied the first prong of Listing 12.05C and recommended remand for further administrative proceeding, to determine whether Plaintiff satisfied the second prong of Listing 12.05C. *Id.* District Judge Walter Rice adopted Judge King's Report and the Commissioner's decision was reversed and the matter was remanded. *Mundy,* No. 3:02-cv-264 at Doc. 17, 18; *see also,* Tr. 411-12; 410.

On remand, Judge McNichols held another hearing, (Tr. 253-300), following which he again found that Plaintiff was not disabled. (Tr. 509-22). In doing so, Judge McNichols determined that Plaintiff was mildly mentally retarded, but that she did not have any other severe physical or mental impairment. *Id.* The Appeals Council granted Plaintiff's request for review and remanded the matter for further proceedings. (Tr. 532-33). Specifically, the Appeals Council determined that the record contained insufficient evidence regarding Plaintiff's additional mental impairments, namely dysthymia and a possible post-traumatic stress disorder. *Id.*

4

On remand from the Appeals Council, Administrative Law Judge James Knapp held a hearing and, following a psychological examination, another hearing, (Tr. 301-24; 325-97), following which Judge Knapp determined that Plaintiff is not disabled. (Tr. 217-44). The Appeals Council denied Plaintiff's request for review, (Tr. 211-13), and Judge Knapp's decision became the Commissioner's final decision.

On October 1, 2002, while the administrative proceedings with respect to her 1998 application were pending, Plaintiff filed another application for SSI which was eventually escalated to the hearing level and consolidated with Plaintiff's 1998, application. *See,* Tr. 536.

In determining that Plaintiff is not disabled, Judge Knapp found that Plaintiff has severe borderline intellectual functioning but that she does not have an impairment or combination of impairments that meets or equals the Listings. (Tr. 243, findings 2, 3). Judge Knapp also found that Plaintiff lacks the residual functional capacity to: (1) follow complex, detailed, or written instructions; (2) do any job requiring reading skills above 3rd grade level or math skills above 4th grade level; or (3) do jobs that involve other than low-stress work activity (*i.e.*, no job involving fixed production quotas, work that is other than routine in nature, or work that is hazardous). *Id.*, finding 5. Judge Knapp then used section 204.00 of the Grid as a framework for deciding, coupled with a vocational expert's testimony, and found there is a significant number of jobs in the economy that Plaintiff is capable of performing. *Id.*, findings 10, 11. Judge Knapp concluded that Plaintiff is not disabled and therefore not entitled to benefits under the Act. (Tr. 244, finding 12).

As an initial matter, this Court concludes that it has already been established in this case that Plaintiff satisfies the first prong of Listing 12.05C.

Notwithstanding the Commissioner's prior finding that Plaintiff is mentally retarded,

5

the law of the case requires this Court to conclude that Plaintiff satisfies the first prong of Listing 12.05C.[2]

The law of the case doctrine precludes a court from reexamining an issue previously decided by the same court, or a higher court, in the same case. *Consolidation Coal Co. v. McMahon*, 77 F.3d 989, 905 n.5 (6th Cir. 1996)(citations omitted). Of course, a district court may always reconsider and revise its interlocutory orders while it retains jurisdiction over the case. *Mallory v. Eyrich,* 922 F.2d 1273, 1282 (6th Cir. 1991); *see also, Rodriguez v. Tennessee Laborers Health & Welfare Fund,* 89 Fed.Appx. 949, 959, 2004 WL 237651 at **8 (6th Cir. 2004). Additionally, the doctrine of law of the case does not apply to a court's findings when that court is overturned by a higher court. *Mallory,* 922 F.2d at 1283(concurring opinion).

In her Report and Recommendations Judge King noted,

> Both psychological tests performed by Dr. Berg and Dr. Bonds generated scores that met the standard of mental retardation in Listing 12.05C. Moreover, neither Dr. Berg nor Dr. Bonds questioned the validity of the intelligence testing administered by them. This Court concludes that the record documents that plaintiff has satisfied the first prong of Listing 12.05C.

*Mundy I,* Report and Recommendations, July 28, 2005, Doc. 16 at 10; Tr. 407. In addition, Judge King recommended that the matter "be remanded to the Commissioner for further consideration of

---

[2] The Court is aware that some impairments may improve over time and therefore *Drummond v. Commissioner of Social Security,* 126 F.3d 837 (6th Cir. 1997) would not apply, and the Commissioner would not be bound by his previous findings with respect to a claimant. However, there is little, if any, information in the medical literature which suggests that mental retardation in humans is reversible or that it improves over time. While recent scientific studies indicate that mental retardation may be reversible in laboratory animals, the relevant studies have involved administration of chemical agents to laboratory animals as well as genetic engineering in laboratory animals. *See, e.g.,* Schmidt, Elaine*, Drug Reverses Mental Retardation Caused by Genetic Disorder–Mouse Study Offers Hope for Correcting Autism's Disruption of the Brain*, UCLA Newsroom, June 22, 2008, http://www.newssroom.ucla.edu/portal/ucla/drug-reverses-mental-retardation-52250.aspx; *see also,* Halber, Deborah, *MIT Locates Key Enzyme for Reversing Retardation in Mice-'Elegant Genitic Manipulation' Inhibits Fragile X Symptoms,* MIT News , June 25, 2007, http://web.mit.edu/newsoffice/2007/fragilex-0625.html.

whether or not plaintiff's mental impairment satisfies the second prong of Listing 12.05C." *Mundy I,* Report and Recommendations at 11-12; Tr. 408-09. District Judge Rice adopted Judge King's Report and remanded the matter, "for further consideration of whether or not plaintiff's mental impairment satisfies the second prong of Listing 12.05C." *Mundy I,* Order, Aug. 27, 2003, Doc. 17 at 1; *see also,* Tr. 411.

The Court's previous finding that Plaintiff's test results met the standard for mental retardation in Listing 12.05C was not a finding in the nature of an interlocutory order nor was it overturned by a higher court. Therefore, the law of the case precludes the Court from reexamining the issue.

The Commissioner essentially argues that even if Plaintiff has satisfied the first prong of Listing 12.05C, she cannot satisfy the Listing because she has failed to satisfy the diagnostic criteria of that Listing. Contrary to the Commissioner's position, this Court concludes that the Court has previously addressed this issue and in doing so, the Court found that Plaintiff does indeed satisfy the diagnostic criteria. The Court reaches its conclusion for two reasons.

> Listing 12.05 provides in part:
>
> *Mental Retardation and Autism:* Mental retardation refers to a significantly sub average general intellectual functioning with deficits in adaptive behavior initially manifested during the developmental period (before age 22)....
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
> ...
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing additional and significant work-related limitation of function;
> ...

20 C.F.R. Pt. 404, Subpt. P, App. 1 §12.05.

7

First, as reflected in the above-quoted language from Judge King's report, which Judge Rice adopted, Judge King clearly determined that Plaintiff "met the standard of mental retardation in Listing 12.05." Implicit in that determination is a finding that Plaintiff has satisfied the diagnostic criteria of Listing 12.05. Second, based on Judge King's Report, in his Order, Judge Rice specifically remanded the matter for a determination of "whether or not plaintiff's mental impairment satisfies the second prong of Listing 12.05C." It would have been nonsensical for the Court to remand the matter to the Commissioner specifically for a determination of whether Plaintiff satisfies the second prong of Listing 12.05C unless the Court had already determined that Plaintiff satisfied the diagnostic criteria as well as the first prong of the Listing. Stated differently, in order to reach the issue of the second prong of Listing 12.05C, the Court had to "get past" the diagnostic criteria as well as the first prong of the Listing.

For the foregoing reasons, this Court concludes that it has previously been established that Plaintiff satisfies the diagnostic criteria of Listing 12.05 as well as the first prong of Listing 12.05C and that the only issue for this Court's consideration is whether Plaintiff satisfies the second prong of Listing 12.05C. That is, the issue is whether Plaintiff has a physical or other mental impairment imposing additional and significant work-related limitation of function.

In 1992, when Plaintiff was fourteen years of age, examining psychologist Dr. Nelson opined that Plaintiff's diagnoses included oppositional defiant disorder. (Tr. 605-11). At that time, Dr. Nelson noted that when she was twelve years old, Plaintiff was in Children's Psychiatric Hospital for two weeks for running away. *Id.* In addition, when she was thirteen years old, Plaintiff was placed in Hillcrest School, a residential facility, due to acting out behaviors and she remained there for about eighteen to twenty-four months. (Tr. 606; 350).

In October, 1997, when Plaintiff was 19 years old, examining psychologist Dr. Berg evaluated Plaintiff and reported that she appeared to be mildly depressed, her speech was relevant, coherent, and clear, her memory was fair, and her attention and concentration were satisfactory. (Tr. 145-50). Dr. Berg also reported that Plaintiff's judgment and insight were fairly good, she was pleasant and cooperative, and that she did not appear significantly anxious, tense, or nervous. *Id.* Dr. Berg noted that Plaintiff reported that she frequently cried, had friends with whom she socialized, enjoyed watching television, and that she had yet to hold down a job for more than a week. *Id.* Dr. Berg also reported that testing revealed Plaintiff's verbal IQ was 70, her performance IQ was 77, and that and her full scale IQ was 72. *Id.* Dr. Berg identified Plaintiff's diagnoses as borderline intellectual functioning and mild dysthymia and he assigned Plaintiff a GAF of 66. *Id.* Dr. Berg opined that Plaintiff was able to understand and follow simple verbal directions, maintain attention and concentration for simple routine tasks, was able to relate adequately to others, and that she was able to cope with the stress and pressure involved in routine day-to-day work. *Id.*

Examining psychologist, Dr. Bonds noted on May 29, 1998, that Plaintiff reported that she needed to get Social Security benefits because her inability to read prevented her from getting a job, that she lived in an apartment and her boyfriend paid her rent, that she denied drug use, and that she spent her day watching television, cooking, cleaning, and doing laundry. (Tr. 99-105). Dr. Bonds also noted that Plaintiff reported problems with controlling her temper, noting that she sometimes gets an attitude with people. *Id.* Dr. Bonds reported that testing revealed that Plaintiff had a verbal IQ of 67, a performance IQ of 76, and a full scale IQ of 69. *Id.* Dr. Bonds also reported that Plaintiff was generally cooperative with testing, but that she seemed irritable and resentful and she exhibited low motivation noting that sometimes Plaintiff gave up on test items or said she did

9

not know the answer without giving them much thought. *Id.* Dr. Bonds reported further that Plaintiff did not have sufficient reasoning, knowledge or judgment to live independently, to make important decisions concerning her future, or to manage her funds without some assistance. *Id.* Dr. Bonds identified Plaintiff's diagnoses as dysthymic disorder and mild mental retardation and he assigned Plaintiff a GAF score of 55. *Id.* Dr. Bonds opined that Plaintiff was mildly limited in her ability to understand, remember, and perform simple one and two step tasks, that her ability to perform routine and repetitive tasks was mildly limited, her ability to relate to other people was moderately limited, her ability to maintain punctuality and attendance was not significantly limited, and that her ability to handle normal work stress was mildly limited. *Id.*

Plaintiff was evaluated at Daymont Behavioral Health Center ("Daymont") on September 26, 2002, at which time it was noted that Plaintiff was a self-referral, that she reported she had a ninth grade education, lived alone, engaged in nude dancing and prostitution for her support, read the Bible daily, that she had anger problems, and that she had been depressed since her baby's death at birth five years ago. (Tr. 460-62). It was also noted that Plaintiff reported that she had witnessed the baby's father being shot to death at her home two months after her baby died, that she used marijuana every two weeks or so, that she had been depressed and had thoughts of suicide since childhood, and that she had attempted suicide four or five times in the past. *Id.* The intake counselor reported that Plaintiff was friendly but guarded, her eye contact was sporadic, her mood was moderately depressed and her affect was flat. *Id.* Plaintiff's diagnoses were identified as major depression, recurrent and severe, post-traumatic stress disorder, and borderline personality disorder; she was assigned a GAF of 50. *Id.* The intake counselor referred Plaintiff to the emergency room for possible admission because she was suicidal. *Id.*

Plaintiff sought emergency room treatment on September 29, 2002, after she threatened her neighbor with a knife during an altercation over a parking space. (Tr. 482-93). The emergency room physician noted that Plaintiff reported that she had been feeling depressed for the last two or three years since the death of her baby and witnessing the murder of the baby's father. *Id.* That physician also noted that Plaintiff reported a two to three year history of "hearing voices", that she was angry about life, and that Plaintiff had homicidal ideations towards her neighbor and thoughts of suicide although no plan. *Id.* The emergency room physician noted that Plaintiff used $40.00 worth of marijuana on a daily basis and had been doing so for the past two to three years and that she recently started using Xanax which she bought on the streets. *Id.* A mental health therapist noted that Plaintiff was alert and oriented, was tearful, had an extremely depressed mood, and that her affect was stable. *Id.* The counselor also noted that Plaintiff reported having auditory and visual hallucinations. *Id.* Plaintiff's diagnoses were identified by the emergency room physician and mental health therapist as depressive disorder, post-traumatic stress disorder, and cannabis dependence. *Id.* Plaintiff was eventually discharged with a referral to Crisis Care for dual diagnosis. *Id.*

Plaintiff was evaluated at Crisis Care on October 2, 2002, at which time a mental health counselor noted that Plaintiff reported a depressed mood, feelings of helplessness and hopelessness, low motivation, excessive guilt, irritability, anger, and an addiction to cannabis and Xanax. (Tr. 440-57). The mental health counselor also noted that Plaintiff was alert and oriented, had an appropriate energy level and normal movements, speech, affect, thought content and mood, and that she had limited judgment, insight, and impulse control. *Id.* The counselor identified Plaintiff's diagnoses as cannabis dependence and depressive disorder NOS and she assigned

Plaintiff a GAF of 50. *Id.*

Plaintiff was evaluated at Daymont again in June, 2006, at which time the mental health care providers including psychologist Dr. Mills noted that Plaintiff reported having a daily low mood, feeling depressed, irregular appetite and sleep, an irritable mood with fits of anger. (Tr. 589-602). The care providers also noted that Plaintiff reported she had delivered a baby two months prior to the evaluation, that she used marijuana regularly during her pregnancy, and that had not used marijuana or alcohol since April, 2006. *Id.* The care providers reported that Plaintiff was not clear on what precipitated her seeking mental health services other than relating that she had been in treatment before and felt she was "getting back" to how she had been. *Id.* Dr. Mills reported further that Plaintiff had normal thought content and circumstantial thought processes, that her mood was depressed and her affect was flat, that she reported no hallucinations, and that she had no impairment of cognition. *Id.* The mental health counselors identified Plaintiff's diagnoses as mood disorder NOS, alcohol abuse, and marijuana abuse and they assigned Plaintiff a GAF of 60. *Id.* Plaintiff was referred for out patient services and she was seen by a counselor on July 10 and 17, 2006, at which time Plaintiff was depressed, tearful, and restless and reported being concerned over problems with housing. (Tr. 626-27).

On September 6, 2006, psychologist Dr. Bonds, again examined Plaintiff and noted Plaintiff reported that she had a six month old daughter, lived in a homeless shelter, had been dating someone intermittently who helped take care of her daughter, and that she stopped working as an exotic dancer in 2005, because she became pregnant. (Tr. 612-26). Dr. Bonds also noted that Plaintiff reported further that she began drinking at the age of twenty-two or twenty-three when she began dancing at a strip club and began smoking marijuana at the age of seventeen, that her daily

12

activities included feeding her daughter, making calls or going to appointments, visiting her friends, and doing laundry and that she used public transportation, *Id.* Dr. Bonds reported that Plaintiff's mood seemed depressed, her affect was broad, she expressed a sense of hopelessness and low self-esteem, and that she acknowledged that she had trouble with controlling her temper, becoming angry easily, argumentative, and sometimes physically aggressive. *Id.* Dr. Bonds also reported that Plaintiff did not display overt signs of anxiety, was alert and oriented, seemed to recognize that she had problems and needed treatment, did not show much insight or understanding of her problems, and that she had very poor judgment and reasoning abilities, but that she had been able to live independently. *Id.* Dr. Bonds reported further that Plaintiff had a verbal IQ of 54, a performance IQ of 50, and a full scale IQ of 48, that Plaintiff had great difficulty understanding directions, and that she may have also performed poorly on the test in order to enhance her chances of getting Social Security. *Id.* Dr. Bonds noted that Plaintiff had scored in the borderline range during his last examination, and that Plaintiff had scored in the extremely low to borderline range on other previous tests. *Id.* Dr. Bonds identified Plaintiff's diagnoses as major depressive disorder and borderline intellectual functioning and he assigned Plaintiff a GAF of 50. *Id.* Dr. Bonds opined that Plaintiff's ability to relate to peers, supervisors or the public was moderately limited, her ability to understand, remember and follow instructions was moderately limited, her ability to maintain attention, concentration, and persistence to perform simple, repetitive tasks was not significantly limited, and her ability to withstand the stress and pressure associated with day-to-day work activities was moderately limited. *Id.*

The medical advisor (MA) testified at the December, 2006, administrative hearing that Plaintiff's IQ scores ranged from the mid-60's to the mid-70's which were suggestive of mild

retardation to borderline intellectual functioning and that she felt that the record evidence established borderline intellectual functioning. (Tr. 361-83) The MA also testified that while there were signs that Plaintiff had a depressive condition, anxiety and panic attacks were not documented by the record. *Id.* The MA testified further that there was no diagnosis of a personality disorder, but that a personality disorder might be worth developing with a treating source. *Id.* The MA also testified that the record did not consistently demonstrate the existence of a second mental impairment. *Id.* The MA testified that the record showed a specific secondary psychological condition of alcohol and marijuana use and she opined that Plaintiff could perform simple tasks with no written instructions and that she could work with the public and coworkers but that Plaintiff could not perform work with production standards such as strict time quotas. *Id.*

As noted above, the issue is whether Plaintiff satisfies the second prong of Listing 12.05C; that is, whether she has a physical or other mental impairment imposing additional and significant work-related limitation of function. In determining that Plaintiff is not disabled, Judge Knapp determined that she does not have such a physical or mental impairment. (Tr. 235). Specifically, Judge Knapp determined that although Plaintiff has been diagnosed at various points with a mood disorder or depressive disorder, the record did not clearly and consistently support the conclusion that Plaintiff has a long-term affective disorder that would have been functionally limiting for any period of twelve months or longer. *Id.* This Court agrees.

At the outset, the Court notes that the record shows that Plaintiff has never consistently received any long-term mental health treatment. While she has sought treatment sporadically at the emergency room or mental health facilities, Plaintiff has apparently not followed through with recommendations for additional, long-term treatment. The evidence from the short-

term treating and the examining sources as well as the MA's testimony fail to establish the existence of a long-term mental impairment that would have been functionally limiting for any period of twelve months or longer.

Examining psychologist Dr. Berg reported that Plaintiff appeared to be, at worst, mildly depressed, that her speech was relevant, coherent, and clear, her memory was fair, her attention and concentration were satisfactory, her judgment and insight were fairly good, she was pleasant and cooperative, and that she did not appear significantly anxious, tense, or nervous. Dr. Berg concluded that Plaintiff was able to understand and follow simple verbal directions, maintain attention and concentration for simple routine tasks, relate adequately to others, and that she was able to cope with the stress and pressure involved in routine day-to-day work. Dr. Berg assigned Plaintiff a GAF of 66 indicating, at worst, some difficulty in her ability to function.

Dr. Bonds reported in May, 1998, that Plaintiff was, at worst, moderately limited in hear abilities to perform some work-related mental functions although other of her abilities were only mildly limited. In addition, Dr. Bonds assigned Plaintiff a GAF of 55 reflecting, at worst, moderate difficulties in her ability to function.

Although Plaintiff sought mental health treatment at Daymont in September, 2002, it was three days before she followed through with the referral to the emergency room for possible admission because she was suicidal. At the time she was seen in the emergency room, it was noted that although Plaintiff was depressed, she was alert and oriented and her affect was stable.

Subsequently, on October 2, 2002, when Plaintiff was evaluated at Crisis Care, it was noted that while Plaintiff had limited judgment, insight, and impulse control, she was alert and oriented, had an appropriate energy level and normal movements, speech, affect, thought content

15

and mood. Plaintiff was assigned a GAF of 50 indicating, at worst, moderate limitations.

Following Plaintiff's evaluation at Crisis Care, there is no evidence that Plaintiff sought mental health treatment or intervention until June, 2006, when she was again evaluated at Daymont. At that time, it was noted that while her mood was depressed and her affect flat, Plaintiff had normal thought content and circumstantial thought processes, reported no hallucinations, and had no impairment of cognition. *Id.* The mental health counselors assigned Plaintiff a GAF of 60, reflecting, at worst, moderate difficulties in her ability to function. The record reveals that after that evaluation, Plaintiff sought counseling at Daymont on a total of two occasions.

When Dr. Bonds examined Plaintiff again in September, 2006, he noted that Plaintiff did not display overt signs of anxiety, was alert and oriented, seemed to recognize that she had problems and needed treatment, did not show much insight or understanding of her problems, and that she had very poor judgment and reasoning abilities, but that she had been able to live independently; he assigned Plaintiff a GAF of 50. *Id.* Dr. Bonds opined that while she was moderately limited in some of her abilities to perform work-related activities, she was mildly limited in others.

In addition to these findings by these mental health experts indicating that Plaintiff is, at worst, only moderately limited in her abilities to function, the MA's testimony indicates that Plaintiff is capable of performing simple tasks with no written instructions and that she could work with the public and coworkers but that Plaintiff could not perform work with production standards such as strict time quotas.

This Court concludes that the Commissioner did not err by finding that Plaintiff does not have an a long-term mental disorder that would have been functionally limiting for any period

16

of twelve months or longer. Accordingly, the Commissioner did not err by failing to find that Plaintiff satisfies Listing 12.05C.

Our duty on appeal is not to re-weigh the evidence, but to determine whether the decision below is supported by substantial evidence. *See, Raisor v. Schweiker,* 540 F.Supp. 686 (S.D.Ohio 1982). The evidence "must do more than create a suspicion of the existence of the fact to be established. ... [I]t must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." *LeMaster v. Secretary of Health and Human Services,* 802 F.2d 839, 840 (6th Cir. 1986), *quoting, NLRB v. Columbian Enameling & Stamping Co.,* 306 U.S. 292, 300 (1939). The Commissioner's decision in this case is supported by such evidence.

It is therefore recommended that the Commissioner's decision that Plaintiff was not disabled and therefore not entitled to benefits under the Act be affirmed.

January 7, 2010.

*s/ Michael R. Merz*
United States Magistrate Judge

# NOTICE REGARDING OBJECTIONS

Pursuant to Fed.R.Civ.P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Pursuant to Fed.R.Civ.P. 6(e), this period is automatically extended to seventeen days because this Report is being served by one of the methods of service listed in Fed.R.Civ.P. 5(b)(2)(B), (C), or (D) and may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within ten days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See, United States v. Walters,* 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).